J-S30007-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MALIK WOODS | |
| Appellant | No. 734 EDA 2014 |

Appeal from the Judgment of Sentence February 25, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0004555-2010;
CP-51-CR-0006164-2010

BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.: **FILED JUNE 16, 2015**

Appellant, Malik Woods, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions of second-degree murder, robbery, criminal conspiracy, firearms not to be carried without a license, carrying firearms in public in Philadelphia, possessing instruments of crime, criminal solicitation, and retaliation against a witness.[1] We affirm in part and vacate in part.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. Therefore, we have no reason to

---

[1] 18 Pa.C.S.A. §§ 2502(b), 3701(a)(1)(i), 903 (3701(a)(1)(i) related), 6106(a)(1), 6108, 907(a), 902(a), and 4953(a), respectively.

J-S30007-15

restate them.[2]

Appellant raises the following issues for our review:

> IS APPELLANT ENTITLED TO AN ARREST OF JUDGMENT WITH RESPECT TO HIS CONVICTIONS UNDER CP-51-CR-0004555-2010 FOR MURDER OF THE SECOND DEGREE, CRIMINAL CONSPIRACY, ROBBERY, CARRYING A FIREARM WITHOUT A LICENSE, CARRYING A FIREARM ON THE STREET OR PUBLIC PROPERTY IN PHILADELPHIA AND POSSESSING INSTRUMENTS OF CRIME AND UNDER CP-51-CR-0006164-2010 FOR SOLICITATION TO COMMIT MURDER AND RETALIATION AGAINST A WITNESS SINCE THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE VERDICTS OF GUILT AS THE COMMONWEALTH FAILED TO SUSTAIN ITS BURDEN OF PROVING APPELLANT'S GUILT BEYOND A REASONABLE DOUBT?
>
> IS APPELLANT ENTITLED TO A NEW TRIAL…AS A RESULT OF THE TRIAL COURT'S RULING THAT ALLOWED THE COMMONWEALTH TO PRESENT THE TESTIMONY OF JERRY HALEY CONCERNING A NOTE HE ALLEGEDLY RECEIVED FROM APPELLANT IN THE ABSENCE OF ANY EVIDENCE THAT APPELLANT PREPARED THE NOTE?
>
> IS APPELLANT ENTITLED TO HAVE HIS SEPARATE SENTENCE FOR ROBBERY VACATED SINCE IMPOSITION OF A SEPARATE SENTENCE FOR ROBBERY FOLLOWING CONVICTION FOR SECOND DEGREE MURDER VIOLATES DOUBLE JEOPARDY?

(Appellant's Brief at 5).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Steven R.

---

[2] On pages 8 and 13 of the trial court's opinion, the court mistakenly refers to witness, "Robin Gore," as "Robert Gore." On pages 9 and 12, the court refers to co-defendant, "Joseph Kelsey," as "Derrick Kelsey," which is an alias for co-defendant.

- 2 -

Geroff, we conclude Appellant's issues one and two merit no relief.[3]  The trial court opinion comprehensively discusses and properly disposes of Appellant's first and second issues.  (**See** Trial Court Opinion, filed November 7, 2014, at 17-21, 23-24) (finding: **(1)** there was sufficient evidence to convict Appellant of conspiring with co-defendant to rob victim, William Duval; witness, Robin Gore, testified purchase of marijuana occurred in his basement between co-defendant and victim on night of incident, co-defendant told Mr. Gore that victim had "shorted" co-defendant during marijuana purchase, Appellant was present when victim was shot, Appellant fired his gun at victim immediately after co-defendant shot victim, and co-defendant went into victim's pockets after shooting; second witness, Lamont Lester, testified co-defendant told victim, "I thought you had it," before co-defendant shot victim; Appellant admitted he was present during murder; robbery conspiracy may reasonably be inferred from fact that co-defendant

_____

[3] In his first issue, Appellant fails to provide any argument regarding the sufficiency of the evidence for his convictions of firearms not to be carried without a license, carrying firearms in public in Philadelphia, and possessing instruments of crime.  Therefore, these claims are waived.  **See** Pa.R.A.P. 2119(a); **Coulter v. Ramsden**, 94 A.3d 1080, 1088 (Pa.Super. 2014) (stating: "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived").  Moreover, in his second issue, Appellant argues the Commonwealth failed to establish a chain of custody for the note; however, Appellant failed to raise this claim in his Rule 1925(b) statement.  Thus, it is waived.  **See Commonwealth v. Castillo**, 585 Pa. 395, 403, 888 A.2d 775, 780 (2005) (stating: "Any issues not raised in a [Rule] 1925(b) statement will be deemed waived") (citation omitted).

went into victim's pockets and then left with Appellant; sufficient evidence existed to convict Appellant of robbery; evidence showed Appellant entered into conspiracy with co-defendant to rob victim, and Appellant inflicted injury on victim in course of committing robbery, where Mr. Gore testified that Appellant fired gun at victim after victim had already been shot and then co-defendant went into victim's pockets; there was sufficient evidence to convict Appellant of second-degree murder, where evidence showed either Appellant or co-defendant could have fired fatal shot at victim; medical examiner testified manner of death was homicide as there were two bullets in victim's body, and cause of death was gunshot wound to neck; Mr. Lester testified co-defendant pointed his gun approximately four feet from victim's face and fired; even if co-defendant fired fatal shot, Appellant was accomplice in conspiracy to rob victim and was criminally liable for second-degree murder; there was sufficient evidence to convict Appellant of retaliation against witness, where Jerry Haley testified that while he and Appellant were incarcerated together, Appellant told Mr. Haley what had occurred and gave note to Mr. Haley as contract to kill Mr. Gore, which contained Mr. Gore's address, because Mr. Gore testified against Appellant at preliminary hearing; Mr. Haley identified note in court and testified he knew Appellant for many years; Mr. Haley also testified he had been part of Black Mafia criminal organization in Philadelphia; jury could have reasonably inferred Appellant knew Mr. Haley's reputation as part of organization, and

approached him because Appellant believed Mr. Haley had experience and willingness to assist Appellant in killing Mr. Gore; Mr. Haley testified he went to his prison counselor one day after receiving note from Appellant; police detective testified he spoke to Mr. Haley's counselor three days after preliminary hearing at which Mr. Gore testified; timing provided jury with reasonable inference that within days of Mr. Gore's testimony, Appellant tried to persuade Mr. Haley to kill Mr. Gore to prevent him from testifying at trial; Mr. Haley had no reason to know Mr. Gore's name or address until Appellant approached Mr. Haley, and was promised nothing in exchange for his testimony; sufficient evidence existed to convict Appellant of solicitation to commit murder; Appellant solicited Mr. Haley to commit murder when Appellant gave Mr. Haley note asking him to murder Mr. Gore; **(2)** there was sufficient evidence that Appellant's note to Mr. Haley was authentic; Commonwealth presented evidence at trial that note was what Commonwealth claimed it to be; Mr. Haley was witness with knowledge and testified that note he was shown at trial was same note Appellant gave to him; minimum requirement for admissibility was met with proper foundation, and no additional evidence needed to authenticate note; timing of note is consistent with inference that Appellant tried to hire Mr. Haley to kill Mr. Gore because Appellant gave note to Mr. Haley two days after Mr. Gore testified at preliminary hearing; jury found note was authentic). The record supports the trial court's decision on issues one and two. Therefore,

we see no reason to disturb it.[4]  Accordingly, we affirm Appellant's first and second issues on the basis of the trial court's opinion.

In his third issue, Appellant argues his separate sentence for the predicate offense of robbery is impermissible because robbery merges with second-degree murder for sentencing purposes.  Appellant maintains a separate sentence for robbery following a conviction for second-degree murder violates double jeopardy.  Appellant concludes this Court should vacate his sentence for robbery.  We agree.

"A claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence.  Therefore, our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Quintua***, 56 A.3d 399, 400 (Pa.Super. 2012), *appeal denied*, 620 Pa. 730, 70 A.3d 810 (2013).  "A challenge to the legality of the sentence may be raised as a matter of right, is non-waivable, and may be entertained so long as the reviewing court has jurisdiction." ***Commonwealth v. Robinson***, 931 A.2d 15, 19-20 (Pa.Super. 2007) (*en banc*).  Whether offenses merge at sentencing implicates Section 9765 of the Sentencing Code, which provides:

> **§ 9765.  Merger of sentences**
>
> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act **and** all of the

---

[4] The following errors appear in the cited section of the trial court's opinion: page 17, paragraph 2, lines 3 and 5, ***Id.*** at 57 and ***Id.*** at 83-84, respectively, refer to (N.T. 02/21/2014) cited throughout the court's opinion.

statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765 (emphasis added). In light of our Supreme Court's decision in **Commonwealth v. Tarver**, 493 Pa. 320, 426 A.2d 569 (1981), a sentencing court has no authority to impose a sentence for felony murder as well as a sentence for the predicate offense. **See also Commonwealth v. Gillespie**, 512 Pa. 349, 516 A.2d 1180 (1986) (restating principle that imposition of separate sentence for underlying felony in felony murder conviction violates Double Jeopardy clause); **Commonwealth v. Garnett**, 485 A.2d 821 (Pa.Super. 1984) (explaining court erred by imposing twenty to forty years' imprisonment on convictions for burglary, arson, and related offenses, in addition to concurrent terms of life imprisonment imposed for convictions on two counts of second degree murder, where burglary and arson convictions were constituent offenses of felony murders); **Commonwealth v. Fortune**, 451 A.2d 729 (Pa.Super. 1982) (holding felony murder and predicate offense merge for sentencing purposes).

"When a defendant challenges one of several interdependent sentences, he, in effect, challenges the entire sentencing plan." **Commonwealth v. Goldhammer**, 512 Pa. 587, 593, 517 A.2d 1280, 1283 (1986), *cert. denied*, 480 U.S. 950, 107 S.Ct. 1613, 94 L.Ed.2d 798 (1987) (citation omitted). "Where we determine that a sentence must be corrected, this Court has the option of amending the sentence directly or remanding it

to trial court for resentencing. If a correction by this Court may upset the sentencing scheme envisioned by the trial court, the better practice is to remand." ***Commonwealth v. Dobbs***, 682 A.2d 388, 392 (Pa.Super. 1996). This Court has also held that when the sentences, "run concurrently, we need not remand for resentencing. Instead this Court merely vacates appellant's sentence…." ***Commonwealth v. Vazquez***, 476 A.2d 466, 469 (Pa.Super. 1984). ***See, e.g., Commonwealth v. Turner***, 434 A.2d 827 (Pa.Super. 1981) (holding no need to remand for resentencing when sentences are imposed concurrently); ***Commonwealth v. Eberts***, 422 A.2d 1154 (Pa.Super. 1980) (holding same).

Instantly, the court sentenced Appellant to life imprisonment for his second-degree murder conviction as well as a concurrent five (5) to ten (10) years' imprisonment for the underlying robbery conviction. The court had no authority to impose a separate sentence for the robbery conviction, where the robbery constituted the predicate felony for Appellant's felony murder conviction. ***See Tarver, supra***. The Commonwealth concedes we have a basis to grant relief on Appellant's third issue. Therefore, we vacate Appellant's judgment of sentence for robbery. ***See Vazquez, supra***. Accordingly, we affirm the convictions, vacate the separate sentence for robbery, and affirm the judgment of sentence in all other respects.

Judgment of sentence affirmed in part and vacated in part.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/16/2015</u>

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA  : CP-51-CR-0004555-2010
                                       : CP-51-CR-0006164-2010

vs.

**FILED**

MALIK WOODS

NOV 07 2014

Criminal Appeals Unit
First Judicial District of PA
OPINION

: SUPERIOR COURT
: NO. 734 EDA 2014

CP-51-CR-0004555-2010 Comm. v. Woods, Malik
Certificate and Transmittal of Record to Appellate Court



7220543091

GEROFF, J.

NOVEMBER 7, 2014

On February 25, 2014, after a jury trial, the Defendant, Malik Woods, was found guilty of murder of the second degree, robbery, criminal conspiracy, carrying a firearm without a license, carrying a firearm on public streets, possessing an instrument of crime, solicitation to commit murder, and retaliation against a witness. For the conviction of murder of the second degree, defendant was sentenced to life imprisonment without parole. A consecutive sentence of five (5) to ten (10) years of imprisonment was imposed on the conviction of solicitation to commit murder. A concurrent sentence of five (5) to ten (10) years of imprisonment was imposed on the conviction of robbery and a concurrent term of five (5) to ten (10) years of imprisonment was imposed on the conviction of criminal conspiracy. A concurrent sentence of two and half (2.5) to five (5) years of imprisonment was imposed for carrying a firearm without a license. No further penalty was imposed on the convictions of carrying a firearm on the public streets, retaliation against a witness, and possessing an instrument of crime.

1

## THE ISSUES

Defendant has raised the following issues verbatim on appeal[1]:

1. The defendant is entitled to an arrest of judgment with respect to his convictions under CP-51-CR-00045552010 for murder of the second degree, criminal conspiracy, robbery, carrying a firearm without a license, carrying a firearm on the street or public property in Philadelphia and possessing instruments of crime and under CP-51-CR-000164-2010 for solicitation to commit murder and retaliation against a witness since the evidence is insufficient to sustain the verdicts of guilt as the Commonwealth failed to sustain its burden of proving the defendant's guilt beyond a reasonable doubt. (N.T. 2/25/14 p. 150-153). The Commonwealth's evidence failed to establish that the defendant was responsible for the death of the victim, that the defendant robbed or attempted to rob the victim, that the defendant possessed an instrument of crime, that the defendant entered into the robbery or killing of the victim, that the defendant solicited another to commit the crime of murder, that the defendant retaliated against a witness or that defendant solicited Jerry Haley to accept any pecuniary or other benefit to intimidate Robin Gore.

2. The defendant is entitled to a new trial as a result of the trial court's ruling that allowed the Commonwealth to present the testimony of Jerry Haley concerning a note he allegedly received from the defendant in the absence of any evidence that the defendant prepared the note. (N.T. 2/21/14 p. 5-6). As a result of the trial court's ruling, the Commonwealth presented testimony from Haley with regard to a note allegedly written by the defendant soliciting Haley to kill Commonwealth witness Robin Gore (N.T. 2/21/14 p. 14-22). The trial court's ruling denied the defendant a fair trial.

---

[1] See Def.'s Concise Statement of Matters Complained of on Appeal, pp. 1-2.

2

## PROCEDURAL HISTORY

On December 16, 2009, Defendant went to Southwest Detectives and turned himself in to police. (N.T. 02/24/14, pp. 44-45). Shortly afterwards, Defendant was charged with one count of aggravated assault, one count of conspiracy, one count of terroristic threats, one count of simple assault, one count of murder, one count of recklessly endangering another person, one county of robbery, one count of burglary, one count of firearms not to be carried without a license, one count of carrying firearms on the public streets, and one count of possessing an instrument of crime for events which occurred at or near 5530 Willows Avenue in the City and County of Philadelphia.

On April 13, 2010, a Preliminary Hearing was held for Defendant and his alleged co-conspirator, Joseph Kelsey. On April 16, 2010, the Commonwealth, as part of its investigation into the murder of victim William Duval, interviewed a witness named Jerry Haley. (N.T. 02/24/14, p. 64). The interview led to additional charges being filed against Defendant. *Id.* at 66. On April 23, 2010, the Commonwealth filed against Defendant Woods the charges of solicitation to commit murder, one count of intimidation of a witness, one count of retaliation against a witness, and one count of obstructing justice.

On February 25, 2014, sentence was imposed. On February 28, 2014, Defendant filed his notice of appeal to the Superior Court. A Concise Statement of Matters Complained of on Appeal pursuant to Pa. R.A.P. 1925(b) was ordered on July 15, 2014. On July 30, 2014, the Defendant filed the Statement. Defendant's notice of appeal, however, had included only trial court docket No. CP-51-0004555-2010, and failed to include trial court docket No. CP-51-0006164-2010. On August 20, 2014, the Superior Court issued an order which permitted the Defendant to amend the notice of appeal to include trial court docket No. CP-51-0006164-2010.

The order directed Defendant to file within ten (10) days of the order an amended notice of appeal, referencing appeal docket No. 734 EDA 2014 and lower court docket Nos. CP-51-0004555-2010 and CP-51-0006164-2010. On August 25, 2014, the Defendant filed his amended notice of appeal to the Superior Court. Defendant's amended notice of appeal referenced both trial court docket Nos. CP-51-000455-2010 and CP-51-0006164-2010.

The Defendant challenges the sufficiency of the evidence for each of his convictions.[2] He also alleges that the trial court ruling that allowed Jerry Haley's testimony to be presented at trial denied him a fair trial.[3]

## THE EVIDENCE

Elizabeth Duval

Elizabeth Duval, the mother of the decedent, became aware of his death on December 12, 2009. (N.T. 02/20/2014, p. 57). She last saw her son the day before he was killed. *Id.*

Dr. Sam Gulino

Dr. Sam Gulino, the chief medical examiner for the City of Philadelphia, testified that he performed an autopsy on the body of William Duval. (N.T. 02/20/14, p. 65). According to Dr. Gulino, Duval sustained two gunshot wounds. One of the gunshot wounds was to the front left aspect of Duval's neck; the other was to Duval's right wrist. *Id.* at 67. The x-rays of Duval's body showed that bullets were still present in the body associated with those two gunshot wounds. Dr. Gulino also found several scrapes on the body, specifically on the right side of the forehead, on the front of the chest, on the right forearm, and on the left leg. According to Dr. Gulino, the scrapes were recent; they showed no sign of healing or scabbing, so they must have had occurred within 24 hours or so before death. *Id.*

---

[2] *Id.*
[3] *Id.*

4

Dr. Gulino set forth in detail for the jury's benefit the nature of the wounds sustained by the decedent and concluded that the cause of death was a gunshot wound to the neck and that the manner of death was homicide. (N.T. 02/20/2014, pp. 64-74). He did not observe soot or stipple on the wounds or on the victim's clothing and concluded that the range of fire was at least two to three feet from the victim. *Id.* at 72-79.

Lamont Lester

Lamont Lester testified that on December 12, 2009, he was at the residence of Robin Gore located at 5530 Willows Avenue in Philadelphia. *Id.* at 83. He and Gore were sitting together in the basement drinking beer, and they began watching a movie. *Id.* After a while, the victim, William Duval, whom Lester referred to as "Bill," came and joined them in the basement. Bill received a phone call and went outside for a minute. *Id.* at 81-84. Mr. Duval returned with two other males, both of whom were flashing their guns. *Id.* at 83, 101. An argument then broke out between Duval and one of the armed males, whom Lester identified as Joseph Kelsey. *Id.* at 84. Lester described the other male who returned with Duval as a little light-skinned guy who was young and short. *Id.* at 89-90, 98. Lester described him as younger and lighter-skinned than Kelsey. *Id.* at 89-90. The light-skinned male began waving his gun around at both Lester and at Robin Gore as soon as he walked in the door *Id.* at 90, 101.

The argument between Duval and Kelsey concerned marijuana; Kelsey said to Duval, "I thought you had it." *Id.* at 85. According to Lester, they were arguing over some weed. *Id.* After Kelsey uttered those words, Kelsey and Duval began "tussling." *Id.* 85. In court, Lester described the tussling between Duval and Kelsey by waving his arms in front of his body. *Id.* at 86. The two were fighting; then Kelsey raised his arm, put his gun about four feet away from

5

Duval's face, and fired the gun. *Id.* at 85. Bill then fell to the ground. *Id.* at 87. Lester recalls hearing only one gunshot. *Id.*

When the gun was fired, Lester got up against the wall and crouched down on the floor. *Id.* at 97. Kelsey then pointed his gun at Robin Gore and told him, "You better not say nothing." *Id.* at 87. Kelsey and the light-skinned male ran out the door. *Id.* Afterwards, Lester went home, where he was met by detectives. *Id.* at 88. When Lester made his written statement to detectives, a detective then showed him a photo array. *Id.* at 92. In the photo array, he identified Robin Gore and Joseph Kelsey. *Id.* at 92-93. At no point during the photo array did he ever identify Malik Woods. *Id.* at 98. He was also shown another photo array containing a picture of Malik Woods, but did not identify Woods. *Id.* at 98-99.

In his statement to detectives, Lester said that as soon as they came in, one of the guys said, "I thought you said you had it," and then struck the decedent on the side of the head with a chrome-plated gun with a black handle. *Id.* at 105. (Ex. C-3, p. 2). The other male individual accompanying Lester then ran out the door. However, at trial, Lester said that he did not previously say that he saw the decedent being struck in the head with a gun. (N.T. 02/20/14, p. 96).

Detective James Crone

Detective James Crone testified that he went to the crime scene at 5530 Willows Avenue, where he gathered evidence. *Id.* at 111. When he arrived, he observed the body of the decedent. According to Detective Crone, the victim's body was in the basement level lying on its back. *Id.* at 112. The victim's body was resting parallel to the stairs leading to the basement. He observed the decedent to be dead, and observed the gunshot wound to the decedent's upper left-hand side

6

of the neck. *Id.* Detective Crone did not see any indication that the body had been moved, nor did he see any streaks or trails of blood around the body. *Id.* at 113.

Detective Crone searched for ballistic evidence, but found none. *Id.* He observed an entry wound, but no corresponding exit wound, all of which was consistent with the bullet or projectile still being located inside the victim's body. *Id.* at 114. Detective Crone testified that he searched the area in the basement for strike marks, but found none. *Id.* at 114. However, Detective Crone did find other evidence at the scene of the crime. He found several beer bottles located within the proximity of the victim. *Id.* at 115. On a chair next to the decedent, he found a jacket with an arm inside out. On the jacket was dirt which was consistent with the dirt on the bare concrete floor. *Id.* In the jacket were credentials, which were discovered to be those of the victim. Detective Crone also found a cellular phone, which was located approximately six feet from the victim's body. *Id.* Marijuana was found underneath the entertainment system in the basement, a circumstance which Detective Crone stated would explain the strong odor of marijuana inside the basement. *Id.* The detective found a box containing what he believed to be marijuana residue in the rear driveway area. *Id.* at 116. He observed blood splatter on both the east and west walls of the basement, approximately 5 to 6 feet above the ground. *Id.* at 116, 124.

Detective Crone testified that he obtained search warrants for 5530 Willows Avenue and 5524 Florence Avenue (the Kelsey residence). *Id.* at 121, 123. Detective Crone testified he participated in a search of both properties. *Id.* Detective Crone recovered various pieces of paperwork at 5524 Florence Avenue.

Jerry Haley

While testifying at trial, Jerry Haley identified Malik Woods by point of finger and name. (N.T. 02/21/2014, p. 14). According to Haley, he had known Malik Woods for a while; they used to talk to each other in the southwest part of the city. (N.T. 02/21/14, p. 15). Haley also knew Woods because they shared the same block of prison housing in 2010. *Id.* According to Haley, Woods had told Haley about his case while they were incarcerated together in 2010. *Id.* at 16. Woods explained to Haley that he "shot the guy in the neck, but he didn't really mean to." *Id.* Woods then gave Haley a note for a contract, as Haley thought he was going to go out on bail the next day. *Id.* Haley explained that the particular contract was to kill a witness, Robert Gore. *Id.* at 17. According to Haley, the note contained Gore's name and address. *Id.* Haley indicated to Woods that he would consider carrying out the contract. *Id.* The following day, Haley told his counselor about the note. *Id.* at 18. The counselor then informed the District Attorney's Office, which sent Detective Thorsten Lucke to pick up Haley. *Id.* at 18, 21. Haley then gave a statement to Detective Lucke regarding the note. *Id.* at 22.

At trial, Haley identified the note which was projected upon a large screen. Haley acknowledged that the note was the same note given to him by Malik Woods. *Id.* Haley then stated that at the top of the note, he wrote the words, "To me." *Id.* at 20. Haley stated that at the top of the note, he wrote the words, "To me." *Id.* at 20. Haley stated that he wrote those words as a "remembrance." *Id.* Haley also testified that the note contained Gore's address. *Id.* at 17.

Haley was asked about his statement to Detective Lucke on both direct and cross-examination. According to Haley, Detective Lucke did not promise Haley anything in return for his statement, and Detective Lucke did not threaten Haley in any way. *Id.* at 22. Moreover,

8

according to Haley, no one promised or threatened him in order to give the statement. *Id.* at 22.

On cross-examination, Haley stated that when he decided to assist the District Attorney's Office

in the Woods case, he did not believe that the District Attorney would have been able to help him

with his own case. *Id.* at 39. Haley stated that he told police about the note because he was

being a Christian and because he wanted his conscience cleared. *Id.* at 38, 40.

As was previously noted, Haley had testified at trial that Woods had explained to him that

he "shot the guy in the neck, but he didn't really mean to." *Id.* at 16. On cross-examination,

Haley was shown the statement he had made to police, a statement that was made a day or two

after he had discussed the note with Malik Woods. In the statement, Haley was asked when and

where the homicide took place. Haley replied:

> "I think it was a house. He [Malik] told me that they went into the guy's house. It was two guns.
> He had a gun and the other guy had a gun in the boy's face. He said that that guy shot the guy in
> the neck and then he shot his gun."

*Id.* at 44-45. After the statement was read, Haley acknowledged that his statement to police

contained differences from his testimony at trial. *Id.* at 45.

Robin Gore

Robin Gore testified he had known William Duval almost his entire life, for over 30

years. *Id.* at 51. Gore testified that in 2009, he was living at 5530 Willows Avenue. *Id.* Gore

then identified the parties to the incident by pointing out Derrick Kelsey and Malik Woods. *Id.*

at 52. Gore stated that Kelsey is his friend and that Woods was with Kelsey when the incident

took place. *Id.*

According to Gore, he had known Kelsey for 15 years, and had worked at the restaurant

owned by Kelsey's parents. *Id.* Gore also partnered with Kelsey in a metal-removal business.

*Id.*

9

Gore stated he did not know Malik Woods, but acknowledged that he had seen Malik Woods on occasions prior to the night William Duval was murdered. *Id.* at 52-53. Gore stated that Woods would sometimes accompany Kelsey when Kelsey would come over to Gore's house. *Id.* at 53. According to Gore, the decedent was a seller of marijuana and that on the night of the murder, he was selling marijuana in the driveway behind 5530 Willows Avenue. *Id.* at 55.

Gore testified that on the night of the murder, he had just gotten off work and went home. He went to the basement, and was sitting there with the decedent and Lamont Lester. According to Gore, they were about to watch a movie. Gore's ex-girlfriend, Sharita Mason, and her two children were also at the residence of 5530 Willows Avenue at the time, but they were upstairs. *Id.* at 54.

Gore was asked when he first encountered either of the defendants on the night of the murder, and he replied that he encountered Kelsey after he had gotten off work, between 5 and 6 in the evening. *Id.* at 56. Kelsey called Gore about purchasing marijuana, and Kelsey then came over to 5530 Willows Avenue to buy marijuana from the decedent. *Id.* at 57. Kelsey went down to the basement, where he apparently made the purchase. *Id.* at 57. Kelsey then left. A short time later, Kelsey called Gore and asked to see the decedent. *Id.* at 58. During this phone call, Kelsey indicated that he wanted to come back to make another transaction. Kelsey also indicated that something was "short" with his last purchase. *Id.* at 83-84. Gore told Kelsey that the decedent was still there, and Kelsey returned. *Id.* at 58.

When Kelsey returned, he and the decedent went outside. They came back inside through the driveway door. *Id.* at 59. At this point, Gore recalls seeing only Kelsey and the decedent; he did not see Woods until a later time. *Id.* When Kelsey and the decedent entered the house, the decedent began taking off his jacket, but almost immediately – before he could even

10

finish taking his jacket off - Kelsey pulled out a gun and aimed it at him. Gore recalled that there was a ten-second pause. *Id.* at 59. The decedent began spinning his jacket to defend himself and keep the gun out of his face. *Id.* at 60, 95. The gun was fired, and the decedent fell to the ground. *Id.* at 60, 96. At the preliminary hearing, Gore had testified that the gun was pointing at the decedent's throat when the shot was fired. (N.T. 04/13/10, p. 33). At the preliminary hearing, Gore acknowledged that the gunshot sounded muffled. *Id.* at 33.

After hearing the first shot and seeing the decedent fall to the ground, Gore saw a second shot from a louder and more powerful gun breeze by him, and noticed Woods in the room holding a gun (N.T. 02/21/14, pp. 60, 64, 90). Gore was surprised to see Woods standing there. *Id.* at 60, 90. Gore believed that the second shot came from a revolver because of the powerful way the gunfire came out of the gun. *Id.* at 64. Gore identified Kelsey's gun as an automatic, because it did not have a tumbler. *Id.* at 65. Gore said that Woods' gun did not have a tumbler either and appeared to be a semiautomatic. *Id.*

After both shots had been fired, Kelsey pointed his gun at Gore's face and told him not to say anything about what had just happened. *Id.* at 61, 95. Kelsey went into the decedent's pocket(s), probably to take marijuana. *Id.* at 61, 92, 107. (Gore could not recall whether Kelsey went into one or both pockets). *Id.* at 107. According to Gore, the defendants left through the driveway. Lamont Lester then exited the basement by walking up the steps. *Id.* at 66. Gore then dialed 9-1-1, and the police arrived within 3 to 5 minutes. *Id.*

Gore gave detectives a written statement in which he identified Joseph Kelsey and Malik Woods as the perpetrators of the crime. *Id.* at 76, (Ex. C-2). He signed his name at the bottom of each page of the statement and to photos of all parties involved, including those of both Malik Woods and Joseph Kelsey. *Id.* at 77, (Ex. C-2). At the preliminary hearing, Gore identified

11

Kelsey and Woods as the perpetrators of the crimes. (N.T. 04/13/14, pp. 7-8, 21-24, 33). At trial, he testified that he had no doubt that Joseph Kelsey and Malik Woods were the individuals who shot the decedent. (N.T. 02/21/14, p. 78).

Gore had told officers at the scene that the assailants were masked men. *Id.* at 67. At trial, Gore explained that he told this story because he loved his friend Derrick, and because he feared for his life. *Id.* at 67-68. According to Gore, he later changed his mind and recanted his story about the masked men because he wanted to tell the truth and because he was uncomfortable with the "mask story." *Id.* at 76.

## Stipulations

### Officer Mark Marchetti

Officer Mark Marchetti would have testified that he and his partner responded to the scene at 5530 Willows Avenue on December 12, 2009, at 5:56 p.m. (N.T. 02/24/14, p. 9). Officer Marchetti would have testified that he and his partner transported Robin Gore from the scene to the Homicide Division. *Id.*

Officer Marchetti would have testified that Robin Gore told him and his partner that two males wearing ski masks broke in through the back basement door, walked up to the victim and shot him. Officer Marchetti would have testified that Gore then added that as the assailants approached the victim, the victim threw a jacket at one of the males to block the gun and started to wrestle with the males, and one of the assailants then shot the victim. *Id.*

12

Officer David Girard

Had Officer David Girard been called to testify, he would have testified that he responded to 5530 Willows Avenue on December 12, 2009. He also would have testified that when he arrived, the first floor was dark but the second floor was lit. He would have testified that he smelled a strong odor of marijuana inside the property. He would have testified that he hollered down the basement stairs, but did not get a response; he then observed a black female peek her head around the bottom of the stairs. He ordered the female to come up; she did, accompanied by a male. *Id* at 11.

Officer William Hill

Officer William Hill would have testified that on December 12, 2009, he responded to 5530 Willows Avenue. When he responded, he encountered Robert Gore and Sharita Mason. He observed the body of the decedent on the basement floor. He observed marijuana in the basement and cocaine on the dining room table. When asked about what happened, Robin Gore told Officer Hill that two males attacked the decedent in the driveway and that he, Robin Gore, then exited the house, found the decedent bleeding, and dragged him into the house. *Id.* at 10.

Officer Raymond Andrejczak

Officer Raymond Andrejczak testified as an expert in the field of firearms identification and ballistics. Officer Andrejczak concluded with a reasonable degree of scientific certainty that both of the bullets found in the body of the decedent were fired from the same firearm, based on the same microscopic markings on the bullets. *Id.* at 26, 30. In his opinion, the bullets came from the .38/.9 mm family of bullets. That family also includes .357 magnum bullets that would have been fired from a .357 magnum revolver. *Id.* at 27-28. He also concluded that the bullets were fired from a revolver, as the bullets are consistent with revolver bullets. *Id.* at 29-30.

13

### Detective John Rossiter

Detective John Rossiter testified that on December 16, 2009, Woods was arrested inside the location of Southwest Detectives at 55th and Pine. *Id.* at 38-40. Detective Rossiter testified that on January 19, 2010, he arrested Kelsey at the North American Motor Inn on City Line Avenue. (N.T. 02/24/2014, pp. 39-41).

### Sergeant Kenneth Flaville

Sergeant Kenneth Flaville testified that on December 16, 2009, he encountered Woods, who came to Southwest Detectives on 5510 Pine Street asking for Detective Lucke. *Id.* at 44. Sergeant Flaville and Detective Kerwin (first name not stated) brought him inside Southwest Detectives and contacted Detective Lucke. After learning that he was wanted for a homicide, they transported Woods to Homicide Headquarters. *Id.* at 45. Sergeant Flaville also testified that while transporting Malik Woods to the Homicide Division, Woods told Flaville that he was present for the homicide, but that it does not mean that he saw anything. *Id.* at 46.

### Detective Thorsten Lucke

Detective Thorsten Lucke testified that he interviewed Robin Gore on the evening of the incident. Detective Lucke testified that Gore initially told him that he could not identify the perpetrators of the incident because they were wearing masks. *Id.* at 52. During their first encounter, Gore was very scared and nervous. He also described the person who was killed as a very good friend of his, a long-time friend. Eventually, Gore was able and willing to identify the people whom he had witnessed shoot the decedent. *Id.* at 53-54.

Detective Lucke also testified that on April 16, 2010, a few days after the preliminary hearing in which Detective Lucke was a witness, Detective Lucke became aware of Jerry Haley when he received a call from a prison counselor who indicated to him that he was counseling a

14

person who had information on an ongoing homicide investigation. *Id.* at 64. Lucke then arranged to meet with Haley. When Haley arrived at Lucke's office, he was interviewed by Detective Lucke and Detective Kane (first name not stated). During the interview, Haley produced a small piece of paper from his left sock and began explaining what the paper was. Detective Lucke described the piece of paper as a handwritten note on one side and a sick call request on the other side. Baed on the information he received from Mr. Haley, Detective Lucke conferred with the District Attorney's office to pursue additional charges. Detective Lucke prepared an affidavit of probable cause to charge Defendant Woods with intimidation, retaliation, obstruction of justice, and solicitation to commit murder. *Id.* at 66. According to Detective Lucke, Haley's demeanor was cooperative and forthcoming. Detective Lucke testified that at the time he did not make any promises to Haley regarding his open matter and that at no time did he have any involvement with Haley's open matter.. *Id.* at 67. Detective Lucke did not make any threats to Haley to get him to come forward, and only knew of him once the prison counselor had called him. *Id.*

## I.     <u>SUFFICIENCY OF THE EVIDENCE</u>

In passing upon a motion in arrest of judgment, the sufficiency of the evidence must be evaluated upon the entire trial record; all evidence must be read in the light most favorable to the Commonwealth, which is entitled to all reasonable inferences arising therefrom; the effect of such a motion is to admit all facts which the Commonwealth's evidence tends to prove. *Commonwealth v. Johnson*, 428 Pa. Super. 494; 631 A.2d 639 (1993) citing *Commonwealth v. Blevins*, 453 Pa. 481, 483 309 A.2d 421, 422 (1973). See also, *Commonwealth v Meadows*, 471 Pa. 201, 369 A.2d 1266 (1977). This court must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable

15

inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond reasonable doubt. *Commonwealth v. Randall,* 758 A.2d 669, 674 (Pa.Super.2000).

The Defendant contends that there is insufficient evidence to establish beyond reasonable doubt the crimes for which he stands convicted. He argues that, therefore, he is entitled to an arrest of judgment. The court finds the Defendant's claims to be meritless. There was sufficient evidence for the jury to find that each and every element of the crimes charged was established beyond reasonable doubt.

Defendant challenges his convictions for conspiracy, robbery, and second-degree murder on the grounds that the evidence was insufficient to convict him of any of those crimes. To be convicted of a conspiracy, a person must have agreed with one or more persons to commit a crime; he must have intended to commit the crime; and one or more of them must have committed an overt act in furtherance of the conspiracy. 18 Pa.C.S.A. § 903. A person is guilty of robbery if, in the course of committing a theft, he inflicts serious bodily injury upon another. 18 Pa.C.S.A. § 3701. Defendant was convicted of second-degree murder. A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony. 18 Pa.C.S.A. § 2502.

With regard to the murder, conspiracy, and robbery convictions, the evidence is sufficient to sustain the convictions. The evidence, taken in the light most favorable to the Commonwealth, and with all reasonable inferences therefrom, is sufficient for the jury to have concluded that each and every element of the crimes charged was established beyond reasonable doubt.

16

The evidence shows that there was a dispute between Kelsey and the victim over marijuana; that Woods was with Kelsey in the basement when the murder occurred; that he entered the basement at about the same time Kelsey did; that both he and Kelsey were armed; and that at least one of them fired at the victim. The evidence also shows that after the victim had been shot, Kelsey, Woods' co-conspirator, went into the victim's pockets. Also, Kelsey and Woods both left 5530 Willows Avenue at approximately the same time. In addition, the evidence showed that Woods gave Haley a note for a contract to kill a witness, Robin Gore.

There is sufficient evidence that Kelsey and Woods entered into and carried out a conspiracy to rob the victim. According to Gore's testimony, there had been a marijuana purchase in the basement of 5530 Willows Avenue earlier in the evening. *Id.* at 57. Before Kelsey came over and shot the victim, Kelsey told Gore that something was short with the transaction Kelsey had made earlier in the evening with the decedent. *Id.* at 83-84. Lamont Lester gave similar testimony; Lester testified that Kelsey, before pointing his gun at the victim and shooting him, told the victim, "I thought you had it." (N.T. 02/20/2014, p. 85, 103). Woods admitted to Sergeant Flaville that he was present for the homicide. (N.T. 02/24/2014, p. 46). Gore also testified that Woods was in the basement. Gore testified that Woods was not only in the basement with Kelsey, but was armed when the murder happened; Gore also testified that Woods fired his gun at the victim almost immediately after Kelsey had fired his. (N.T. 02/21/2014, p. 60). Moreover, Gore testified that Kelsey went into the pockets of the victim after the victim had been shot. *Id.* at 61, 92. A conspiracy to rob the victim may reasonably be inferred from the fact that after Kelsey went into the victim's pockets, both defendants left at about the same time. *Id.* at 66, (N.T. 02/20/2014, p. 87). Based on the facts presented at trial,

17

there was sufficient evidence for the jury to convict Woods of conspiring with Kelsey to rob the victim.

There is sufficient evidence to convict Woods of robbery. A person is guilty of robbery if, in the course of committing a theft, he inflicts bodily injury upon another. 18 Pa.C.S.A. § 3701. As already stated, the evidence shows Woods entered into a conspiracy with Kelsey to rob the victim. In the course of committing the theft, Woods inflicted injury on the victim; Robin Gore testified that Woods fired a gun at the victim after the victim had already been shot. (N.T. 02/21/2014, p. 60). Gore testified that Kelsey then went into the victim's pockets probably with the intention to take marijuana. *Id.* at 61, 92, 107.

There is sufficient evidence to convict Woods of second-degree murder. A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony. 18 Pa.C.S.A. § 2502. The evidence shows that either Woods or Kelsey committed a criminal homicide by delivering the fatal shot to the victim's body. Dr. Gulino testified that the manner of death was homicide and that there were two bullets in the victim's body. (N.T. 02/20/2014, p. 74, 67). Dr. Gulino also testified that the cause of death was the gunshot wound to the neck. *Id.* at 73. Even if Kelsey was the one who fired the fatal shot to the neck, Woods was his accomplice in the conspiracy to rob the victim. Woods, therefore, is criminally liable for the second-degree murder of the victim even if Woods did not actually fire the fatal shot. Lamont Lester testified that Kelsey raised his arm, put his gun about four feet from the decedent's face, and then fired the gun. (N.T. 02/20/2014, p. 86). Gore testified that Kelsey pulled his gun out, aimed it at the decedent, and then fired the gun. (N.T. 02/21/2014, p. 60). Based on the testimony of the witnesses, there was sufficient evidence for the jury to infer that Kelsey fired the fatal shot to the

18

neck. The evidence shows that Kelsey was the one who directly committed the criminal homicide, and that Woods was his accomplice. There is, therefore, sufficient evidence to convict Woods of second-degree murder.

Jerry Haley's testimony belies Woods' claim that the evidence was insufficient. Haley testified that while he and Woods were incarcerated together, Woods told him what had happened, and gave him a note for a contract to kill a witness, Robin Gore. *Id.* at 15-17. The note contained Gore's address. *Id.* at 17. Haley's testimony, along with other evidence presented at trial, was sufficient evidence for the conviction of retaliation against a witness and also provides evidence of Woods' guilt for the other crimes for which he was convicted.

A person is guilty of retaliation against a witness if he harms another by any unlawful act or engages in a course of conduct or repeatedly commits acts which threaten another in retaliation for anything lawfully done in the capacity of witness. 18 Pa.C.S.A. § 4953. The evidence was sufficient to convict Defendant Woods for retaliation against a witness, because the note Haley was given by Woods was for a contract to kill Robin Gore, a witness who had lawfully testified as a witness against Woods at the preliminary hearing.

According to Haley, Woods gave Haley the note and explained to him the situation that had happened. (N.T. 02/21/2014, p. 16). Haley testified that the note Woods provided him was for a contract to kill Robin Gore, and that the note had contained Gore's address. *Id.* at 17. When shown the note in court, Haley immediately identified it. *Id.* at 19. Haley identified Woods in court and testified that he had known Woods for years. *Id.* at 14, 15. Haley testified that he had been part of the Black Mafia, a criminal organization with a brutal reputation in Philadelphia. *Id.* at 23. The jury could have reasonably inferred that Woods was likely to have known of Haley's reputation as part of the organization; the jury could have also reasonably

19

inferred that he approached Haley because he thought Haley would have the experience and the willingness to assist him in killing a witness whom he [Woods] had seen just days earlier at the preliminary hearing. (N.T. 04/13/2014, p. 6).

Haley testified that he went to his counselor with the note just a day after receiving it from Woods. (N.T. 02/21/2014, p. 20). In addition, Detective Lucke testified he heard from Haley's counselor about the note on April 16, 2010, just three days after the preliminary hearing. (N.T. 02/24/2014, p. 64). The timing, therefore, would have provided the jury with a reasonable inference that within days of Woods seeing Gore at the preliminary hearing, Woods decided to try and persuade Haley to kill Gore to prevent him Gore from testifying at trial.

Moreover, there is no reason Haley would have known the name or address of the witness until he was approached by Woods, who told him about Gore and gave him a note containing Gore's address. Detective Lucke stated at trial that he made no threats or promises to Haley. *Id.* at 66-67. Detective Lucke also stated at trial that he had no prior knowledge of Haley's connection to the case. *Id.* At trial, Haley corroborated Lucke's testimony about the note by indicating that no one had threatened or promised him anything in return for his statement. (N.T. 02/21/2014, p. 22).

Haley's testimony, along with the other evidence presented at trial, provided sufficient evidence to convict Defendant Woods of solicitation to commit murder. A person is guilty of solicitation to commit a crime if with the intent of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct which would constitute such crime or an attempt to commit such crime or which would establish his complicity in its commission or attempted commission. 18 Pa.C.S.A. § 902. Woods solicited Haley to commit murder when he asked Haley to murder witness Robin Gore by giving Haley

20

the note in question. The evidence presented was sufficient to convict Woods of solicitation to commit murder.

At trial, counsel suggested that Gore was not a credible witness. Although on the evening of the incident Gore initially told Detective Lucke that the perpetrators were two men in ski masks (N.T. 02/24/2014, p. 52), Gore's explanation for fabricating his original story is persuasive. According to Detective Lucke, Gore was visibly shaken by what had just transpired. *Id.* at 53. Detective Lucke described him as being very scared and nervous. *Id.* Gore also described to Detective Lucke the person who had been killed as a very good friend of his, a long-time friend. *Id.* At trial, Gore explained that initially he had told police the story about the masked men because he was afraid for his life. (02/21/2014, p. 67). He also testifeid that he did not initially tell the truth about what had actually happened because Kelsey was a close friend of his. *Id.* at 67-68. This court finds Gore's explanation for the differing stories to be persuasive. Gore was visibly shaken by what had happened, and he was afraid for his own life. Both Kelsey and the victim were friends of his, and Gore had just witnessed a violent murder. It was, therefore, expectable that initially Gore was not completely forthcoming about what had actually happened.

Defendant Woods also argues that there was insufficient evidence to convict him of carrying a firearm without a license, carrying a firearm on the public streets, and possessing an instrument of crime.

To find the defendant guilty of carrying a firearm without a license, three elements must be proved beyond reasonable doubt. 18 Pa.C.S.A. § 6106: First, that the defendant carried a firearm concealed on or about his person; second, that the defendant was not in his home or place of business; and third, that the defendant did not have a valid and lawfully issued license for

21

carrying the firearm. *Id.* First, there was sufficient evidence Woods carried a firearm concealed on or about his person. The evidence shows Woods was armed and was present for the homicide. Woods was in the basement of 5530 Willows Avenue; he himself admitted that he was present. (N.T. 02/24/2014, p. 46). Robin Gore saw Woods in his basement with a gun, and he was surprised to see Woods in his house. (N.T. 02/21/2014, p. 60). Woods was in the basement with a gun, and he clearly had not been invited. It would have been reasonable, therefore, for the jury to infer that Woods traveled to 5530 Willows Avenue with his firearm concealed on or about his person. Second, Woods was not in his home or place of business. Third, the evidence showed that the defendant did not have a valid and lawfully issued license for carrying his firearm (N.T. 02/24/2014, p. 95), (Ex. C-40).

To find a defendant guilty of possessing an instrument of crime, three elements must be proved beyond reasonable doubt. 18 Pa.C.S.A § 907: First, that the defendant possessed an item; second, that the item was an instrument of crime; and third, that the defendant possessed the item with the intent to employ it criminally. *Id.* According to Gore, Woods fired a gun at the victim after the victim had already been shot. (N.T. 02/21/2014, p. 60). Woods possessed an item, a gun, which was an instrument of crime, and which he clearly intended to employ criminally. There was, therefore, sufficient evidence that Woods possessed an instrument of crime.

To find the defendant guilty of carrying a firearm on the public streets, each of following elements must be proved beyond reasonable doubt. 18 Pa.C.S.A. § 6108: First, that the defendant carried a firearm on the public streets of Philadelphia, and second, that the defendant did not have a valid and lawfully issued license to carry the firearm. *Id.* The evidence was clearly sufficient to establish both elements beyond reasonable doubt.

22

## II.  ADMISSIBILITY OF THE NOTE

A document is authenticated by evidence sufficient to support a finding that a matter in question is what its proponent claims. Pa.R.E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be may be sufficient to authenticate or identify the evidence. *In re F.P.*, 878 A.2d 91, 93-94 (Pa. Super. 2005), *See* Pa.R.E. 901(b)(1). Another way is to show distinctive characteristics. Pa.R.E. 901(b)(4). Rule 901(b)(4) provides for authentication by appearance, contents, substance, internal patterns, or other distinctive characteristics taken in conjunction with circumstances. Contrary to what Defendant's counsel stated at trial, it is not necessary that the matter in question be authenticated by evidence as to the genuineness of handwriting. Rather, it is sufficient to authenticate the matter in question by providing simply the testimony of a witness with knowledge, or by showing distinctive characteristics. Pa.R.E. 901(b)(1), 901(b)(4). Taking the evidence in the light most favorable to the Commonwealth, the evidence presented is sufficient to support a finding that the note is authentic.

At trial, the Commonwealth, through the testimony of its witness Jerry Haley, presented evidence that the note was what they claimed it to be. When Haley was shown the note at trial, he said, "That's the note." (N.T. 02/21/2014, p. 19). Haley was a witness with knowledge. He said that the note he was shown was the same note Woods had given him. The minimum requirement for admissibility was met; a foundation was laid. Once a foundation is laid, the question becomes what weight should be assigned to the evidence by the fact finder. *Commonwealth v. Thomas*, 522 Pa. 256, 274, 561 A.2d 699, 707 (1989). Defendant's arguments

23

here against the admissibility of the note are without merit, because his arguments go to the weight of the evidence, rather than to the admissibility of the evidence. Once a foundation was laid, no additional evidence, such as proof of handwriting, was needed to authenticate the note.

The jury could have found that the note was authentic because of the timing and the circumstances surrounding the note. When Defendant Woods was at his preliminary hearing on April 13, 2010, he saw Gore testify. He realized that Gore was going to be a witness against him at trial. The jury could have found that Woods then decided that in order to prevent Gore from testifying, he would have to hire Haley, a man with a notorious gang reputation, to kill the witness.

The timing and the circumstances strongly suggest that the note is authentic. Haley testified that after receiving the note from Woods, he went to his counselor the following day. (N.T. 02/21/2014, p. 20-21). Detective Lucke testified that heard from Haley's counselor on April 16, 2010. (N.T. 02/24/2014, p. 64). Haley received the note from Woods just two days after the preliminary hearing. The timing is consistent with the inference that Defendant Woods decided to try to hire Haley to kill Gore after the defendant learned at the preliminary hearing that Gore was going to be a witness against him at trial. Moreover, there is no reason that Haley would have known the name or address of the witness until he was approached by the defendant. The timing and circumstances are sufficient to authenticate the note. Pa.R.E. 901(b)(4).

24

## CONCLUSION

The arguments made by Defendant lack merit. For the reasons set forth above,

Defendant's judgment of sentence should be affirmed.

BY THE COURT:

STEVEN R. GEROFF, J.

25